SATTAR NADJMEHCHI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nadjmehchi v. Commissioner
Docket No. 45254-86
United States Tax Court
T.C. Memo 1994-42; 1994 Tax Ct. Memo LEXIS 44; 67 T.C.M. (CCH) 2097; February 2, 1994, Filed *44 Decision will be entered for respondent. For petitioner: Victor Sherman and Janet Sherman. For respondent: Steven M. Roth and David A. Winsten. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: On July 3, 1986, respondent made a jeopardy assessment against petitioner for 1985. On August 29, 1986, respondent mailed a notice of deficiency to petitioner for 1985 reflecting a deficiency in petitioner's Federal income tax and additions to tax as follows: Additions to Tax Sec.
Sec.
Sec.
Sec.
Deficiency
6651(a)(1) 6653(a)(2) 6653(a)(1)
6661
$ 9,469,474
$ 2,367,368 *
$ 473,473
$ 946,948
*50 percent of the interest due on the portion of the underpayment attributable to negligence.
All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure. After settlement, the primary issue for decision is whether respondent's determination that petitioner in 1985 received substantial illegal income from the sale of heroin was arbitrary and constituted a naked assessment with respect to which the burden of proof would shift to respondent. FINDINGS OF FACT Some of the facts have been stipulated *45 and are so found. Prior to his arrest in October of 1985 in Vienna, Austria, for drug trafficking, petitioner resided in Los Angeles, California. On November 25, 1986, petitioner filed his petition, at which time he was incarcerated in an Austrian prison in Garsten, Austria. On October 9 and 10, 1991, pursuant to Rule 81 and the Laws of Austria, petitioner's evidentiary deposition was taken at the Austrian prison. During the trial of this case on February 16 through February 18, 1993, petitioner remained incarcerated. In early 1985, the U.S. Drug Enforcement Agency (DEA) began an investigation of petitioner for drug trafficking. Among other things, DEA agents monitored conversations between petitioner and undercover DEA agents and informants. During the monitored conversations, petitioner acknowledged his experience and participation in drug sales, and petitioner described methods he used to conceal his assets. Petitioner told an undercover DEA agent and DEA informant that he received and sold 50 kilos of heroin every 4 to 6 weeks, that he could deliver over 100 kilos of heroin in Japan or Hawaii, and that he could deliver smaller amounts of heroin almost anywhere. Petitioner *46 also told the DEA informant that he could deliver heroin in the Middle East, Europe, Turkey, and India, and that he smuggled heroin into the United States by hiding it in engines or other equipment. Petitioner told an undercover DEA agent that he could obtain foreign passports under false names and that with these foreign passports and false identities, petitioner maintained various bank accounts in which he concealed the proceeds of his illegal drug sales. Petitioner stated to an undercover DEA informant that he preferred to conceal the proceeds of his illegal drug sales in foreign bank accounts and that he owned a foreign trust fund in his mother's name with a $ 4 million balance. In 1978, approximately $ 1.4 million was transferred from petitioner's bank account in Iran to petitioner's bank account in California at Bank of America, N.T. & S.A. Most of these funds were used to purchase various parcels of real property in California. Petitioner told an undercover DEA agent that all of the real property petitioner purchased was purchased with proceeds of illegal drug sales. In August of 1985, petitioner in Los Angeles, California, introduced an undercover DEA agent to an officer *47 of Bank of Credit and Commerce International. The bank officer suggested ways for the DEA agent to launder money by using foreign bank accounts. Surveillance of petitioner by DEA agents included instances in which petitioner conducted drug negotiations and illegal drug sales directly with undercover DEA agents and informants. Further, DEA agents had information from a San Diego Police officer and from a private citizen in San Diego that petitioner, in 1985, sold heroin in San Diego, California. Petitioner on three separate occasions illegally provided undercover DEA agents with heroin, and petitioner on a fourth occasion was arrested for attempting to sell heroin to a DEA agent. These four specific transactions are described below. On March 8, 1985, petitioner, through a DEA informant, provided an undercover DEA agent with a free sample of heroin. On March 22, 1985, in Los Angeles, California, petitioner sold to an undercover DEA agent 1/2 of 1 kilo of heroin for $ 75,000. Petitioner, in connection with this sale, gave an undercover DEA informant a commission in the amount of $ 10,000. Three persons were involved in the sale of the 1/2 kilo to the undercover DEA agent -- *48 namely, petitioner, one of petitioner's heroin suppliers, and the DEA informant. The evidence, however, is unclear regarding the cost of the heroin to petitioner and the amount of petitioner's profit. On June 22, 1985, in Vienna, Austria, petitioner sold to an undercover DEA agent 1 kilo of heroin for $ 35,000. Petitioner received $ 17,500 of the sales proceeds, and the remaining $ 17,500 was paid to another individual who had delivered the heroin to petitioner. On October 11, 1985, in Vienna, Austria, petitioner attempted to sell to an undercover DEA agent 50 kilos of heroin for $ 1,375,000 ($ 27,500 per kilo) at which time petitioner was arrested for drug trafficking, and the 50 kilos of heroin were seized. In 1985, petitioner was convicted in Austria for drug trafficking for his involvement in this 50 kilo transaction. From his various sources and suppliers, it took petitioner only 7 days to acquire the 1/2 kilo of heroin, 11 days to acquire the 1 kilo of heroin, and 6 weeks to acquire the 50 kilos of heroin that he had available for sale in the above transactions. Petitioner's explanation for taking 6 weeks to acquire the 50 kilos of heroin was that a 24 kilo shipment of *49 heroin, in the process of being shipped to him in Austria, was seized by Yugoslavian border authorities. The Austrian police confirmed with Yugoslavian police authorities this seizure of 24 kilos of heroin. On October 31, 1985, after petitioner's arrest in Austria, the Superior Court of California, County of Los Angeles, appointed a receiver to manage and sell petitioner's property in the United States. As a result of selling petitioner's property over which the receiver obtained control, the receiver had approximately $ 1.5 million in cash in the United States. The receiver did not obtain control of, nor sell any foreign-based assets or foreign-based bank accounts that petitioner owned. Search warrants were executed on petitioner's home, office, and several other properties owned by petitioner. No cash or drugs were found. An inventory of petitioner's files reflected numerous domestic and foreign bank accounts in petitioner's control. Over 50 warrants were served on banks where petitioner maintained accounts in the United States. The DEA, however, did not have subpoena power over petitioner's foreign bank accounts. Only a small number of banks responded to the subpoenas, *50 and petitioner's bank accounts at those banks did not reflect excessive deposits. Petitioner did not file a 1985 Federal income tax return, nor did petitioner introduce any records at trial reflecting his 1985 income or expenses from illegal heroin sales. In 1985, heroin produced in Southwest Asia was being sold in the United States by drug distributors such as petitioner for approximately $ 150,000 per kilo. Outside the United States, the sales price for 1 kilo of heroin would be substantially less. Given the lack of evidence as to petitioner's cost for the heroin he sold, respondent used a standard cost factor of 50 percent of the projected sales price, which resulted in a cost calculation for the heroin petitioner was projected to have sold in the United States in 1985 of $ 75,000 per kilo. Initially, on audit, based on petitioner's statements and other evidence, respondent determined that petitioner in 1985 sold 50 kilos of heroin per month. In respondent's computation in the notice of deficiency, however, respondent adjusted for, among other things, the difference between the United States and the foreign sales price of heroin by reducing the quantity of petitioner's projected *51 monthly heroin sales from 50 kilos per month to 25 kilos per month. Respondent thus determined that from January through October of 1985 petitioner sold an average of 25 kilos of heroin per month. Based on the above, respondent in the notice of deficiency determined that in 1985 petitioner received, from illegal heroin sales, a total of $ 37.5 million in gross income ($ 150,000 per kilo X 25 kilos per month X 10 months), at a cost of $ 18.75 million, and that petitioner realized taxable income in 1985 from illegal heroin sales of $ 18.75 million. Respondent also determined the various additions to tax. [1]
OPINION Under section 61, gross income includes "all income from whatever source derived," including income derived from illegal activities. , citing . Taxpayers have a duty to maintain adequate records of illegal income to enable them to file Federal income tax returns. , affg. in part and revg. in part . *52 Where taxpayers keep no records of illegal income and file no income tax returns, respondent is entitled to reconstruct or to project the taxpayers' gross receipts and costs to arrive at a determination of the taxpayers' unreported income. (sustaining respondent's determination that, in a 10-month period, the taxpayer earned $ 33 million from drug sales). Where respondent has introduced evidence linking the taxpayer to illegal drug sales, and where the taxpayer has filed no returns and kept no records, respondent has great latitude in projecting income from illegal activity and in determining the taxpayer's income tax liability with regard thereto. ; ; see also , affg. . Further, respondent's determination in a notice of deficiency is generally entitled to a presumption of correctness that places upon the taxpayer the *53 burden of proof and the burden of going forward with evidence to establish the correct amount of the taxpayer's income relating to the activity. Rule 142(a); . Even though respondent's determination may be based on hearsay, we ordinarily will not look behind a notice of deficiency to examine the sufficiency of the evidence upon which respondent relied in making the determination. , affd. without published opinion (7th Cir. 1986); . As a practical matter, however, it is not easy for taxpayers to prove a negative -- namely, that they did not receive alleged illegal income charged to them by respondent in a notice of deficiency. , revg. . In such cases, therefore, in order for respondent to rely upon the presumption of correctness of a notice of deficiency, it is generally necessary for respondent to offer some predicate evidence *54 linking the taxpayer to the specific illegal income-producing activity alleged in the notice of deficiency. , affg. ; ; ; Where it is demonstrated that respondent's determination in a notice of deficiency is arbitrary or without foundation, it will be regarded as a naked assessment, and the burden of going forward with the evidence will shift to respondent. ; ; In this case, and on the record before us, the factual basis for respondent's determination of petitioner's income from heroin sales is established and is reasonable. Respondent examined investigative reports prepared by the DEA and documents from petitioner's *55 files that were obtained through search warrants. Respondent's computation of petitioner's illegal taxable income was based on, among other things, the following evidence: (1) Petitioner's statements to an undercover DEA agent acknowledging petitioner's sale of 50 kilos of heroin every 4 to 6 weeks, the concealing of assets, and the use of false names for bank accounts and passports; (2) an informant's statement that in February of 1985, petitioner's drug organization was expected to receive a shipment of 250 kilos of heroin; (3) petitioner's conviction for illegal drug sales; (4) petitioner's 3 heroin sales in 1985 to DEA agents; and (5) petitioner's statement that the 24 kilos of heroin seized at the Yugoslavian border belonged to him. Additionally, in making the determination, respondent considered information relating to petitioner's use of wire transfers and petitioner's alleged ownership of over 65 bank accounts. Based on the information available to respondent, respondent reasonably concluded that petitioner was a major heroin dealer and that in 1985 petitioner realized substantial unreported income from heroin sales. In making the determination at issue herein, respondent *56 relied largely on hearsay evidence. Such evidence may be considered and is admissible for the limited purpose of deciding whether respondent acted arbitrarily in determining the tax liability set forth in the notice of deficiency. . Because respondent's determination as set forth in the notice of deficiency did not constitute a naked assessment, and a presumption of correctness attaches to respondent's deficiency determination for 1985, the burden of going forward with evidence, as well as the burden of proof, to establish petitioner's correct tax liability and to establish petitioner's nonliability for the additions to tax remains with petitioner. See , affg. (affirming this Court's holding that respondent adequately linked the taxpayer to illegal drug sales and holding that the presumption of correctness attached to respondent's deficiency determination); , affg. ; *57 Further, at the trial of this case, petitioner did not satisfy his burden of proving respondent's deficiency determination to be erroneous. To the contrary, the record herein (namely, among other things, petitioner's conviction for drug trafficking in Austria, the testimony of DEA agents, petitioner's three heroin sales to DEA agents, the numerous domestic and foreign bank accounts in petitioner's control, and petitioner's use of a passport in a false name) establishes that petitioner in 1985 was involved in illegal heroin sales and that petitioner received substantial income in connection with his heroin sales. Petitioner asserts that statements he made to an undercover DEA agent were mere "puffery." Petitioner asserts that he lied to the DEA agent and that the statements he made (namely, that he sold 50 kilos of heroin every 4 to 6 weeks, that he concealed assets, and that he used false names for bank accounts and passports) were exaggerations made only to gain the agent's confidence. Petitioner also asserts that he participated in just a few heroin sales and that he did so only because he was in financial trouble *58 caused by his divorce and that he divided with associates the proceeds from his sale of heroin. We find petitioner's assertions to be self-serving, totally lacking in credibility, and we reject them. See . Petitioner has failed to satisfy his burden of proof, and we attribute all income from petitioner's heroin sales in 1985, as determined in respondent's notice of deficiency, to petitioner. Respondent determined that petitioner is liable for additions to tax under sections 6651 (a)(1), 6653(a)(1) and (2), and 6661. Respondent conceded that petitioner is not subject to the addition to tax under section 6661. Petitioner has the burden of proof to show that respondent erroneously determined the additions to tax under sections 6651(a)(1), and 6653(a)(1) and (2). Rule 142(a); . Petitioner has not offered any credible evidence, nor made any separate arguments, regarding these additions to tax. We sustain respondent's determinations for 1985 of the additions to tax under sections 6651(a)(1), and 6653(a)(1) and (2). Decision will be entered *59 for respondent. Footnotes
1. In a Stipulation of Settled Issues filed with the Court on February 16, 1993, respondent conceded that petitioner is not subject to tax under sec. 6661.↩